H7RHSERS

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                          17 Cr. 60 (JSR)

5

   EDWARD J. SERVIDER aka Nicholas Halden,
6
                                         Sentence
7            Defendant.

8  ------------------------------x

9                                        New York, N.Y.
                                         July 27, 2017
10                                       4:41 p.m.

11

   Before:
12
                        HON. JED S. RAKOFF,
13
                                         District Judge
14
                           APPEARANCES
15
   JOON H. KIM
16      Acting United States Attorney for the
        Southern District of New York
17 CHRISTINE MAGDO
        Assistant United States Attorney
18
   JOSEPH V. SORRENTINO
19      Attorney for Defendant

20 ALSO PRESENT:   CONSTANTINE VOULGARIS, Special Agent FBI

21

22

23

24

25

H7RHSERS

1          (Case called)

2          THE COURT:  We're here for sentence.  The total

3     offense level is 25, the criminal history category is I, and

4     the guideline range is 57 to 60 months.  The probation office

5     recommends 57 months' imprisonment.  However, the Court, of

6     course, is not bound by the guidelines and will, therefore,

7     consider all the factors under Section 3553(a).

8          Against that background, let me hear first from

9     defense counsel, then from government counsel, and then from

10    the defendant if he wishes to be heard.

11         MR. SORRENTINO:  Thank you, your Honor.  Your Honor,

12    may I stand at the counsel table or --

13         THE COURT:  Sure.

14         MR. SORRENTINO:  Judge, as you know, we have submitted

15    to your Honor dated July 19 a letter memorandum seeking your

16    Honor to sentence Mr. Servider to a term of probation.  We are

17    aware of the probation department's recommendation of 57

18    months.  We are aware that the government is asking your Honor

19    to sentence Mr. Servider within the guideline range, but for

20    the reasons we set forth in our memorandum, for the reasons set

21    forth in the many character letters submitted on behalf of

22    Mr. Servider, and, of course, we submitted to your Honor a

23    somewhat lengthy letter from Mr. Servider.  Quite frankly,

24    Judge, in all my years of practice, that's about the longest

25    letter I've allowed a client to submit to a judge before

H7RHSERS

1   sentencing, but I thought it was important because I thought

2   that it, quite frankly, illuminated quite in detail

3   Mr. Servider's involvement in the conspiracy before your Honor.

4          Judge, we are asking you to sentence Mr. Servider to

5   probation for some obvious reasons and maybe some not so

6   obvious reasons.  He is 29 years old.  He has never been in

7   trouble before in his life.  He has been married about three

8   years now.

9          THE COURT:  He committed a serious and sophisticated

10  crime involving millions of dollars, involving at least 100

11  victims.  He wasn't the prime mover, but the prime mover

12  received a sentence -- I'm trying to remember if it was

13  something like eight years, or something like that.

14         MS. MAGDO:  Eighty-seven months.

15         THE COURT:  So what possible basis would there be for

16  me giving him probation?

17         MR. SORRENTINO:  Frankly, to be --

18         THE COURT:  And your submission was excellent and much

19  to be commended, but I'm, frankly, a little astonished that you

20  would ask for probation in a situation like that.  A crime of

21  that magnitude that he knowingly, willfully participated in

22  over a substantial period of time doesn't merit any prison

23  time?

24         MR. SORRENTINO:  Well, Judge, our argument to your

25  Honor, as we put forth in the memo -- and I will obviously

H7RHSERS

1    answer your Honor's question -- we asked for straight

2    probation, Judge.  I'm not going to be disingenuous, Judge.  I

3    knew that when we asked for it, it was a stretch.  I'm not

4    going to suggest to your Honor that I didn't realize that, when

5    we made that request, it would be an unusual sentence; it would

6    be a stretch from perhaps the norm.  But I thought,

7    nevertheless, Judge, it was reasonable under all of the

8    circumstances when you focus on the factors in Section 3553 in

9    terms of the nature and circumstances of the crime and the

10   characteristics and history of the defendant.

11           I mean that by this, Judge:  Mr. Servider from the

12   very beginning has taken the position that although he, quite

13   frankly, committed what I think would be considered to be fraud

14   in the inducement by using a false name, by using a false

15   trading history, by inducing clients to invest under false

16   pretenses and therefore, quite frankly, allowing the money to

17   be misspent, nevertheless, Judge, it has always been his

18   position -- it remained his position during his allocution and

19   it remains his position today -- that the actual stealing of

20   the money, the actual outright stealing of the money, was

21   carried on by Mr. Ekdeshman and Mr. Vilner, unbeknownst to him.

22   And quite frankly, Judge, that was a situation where on the

23   day-to-day basis, although Mr. Servider --

24           THE COURT:  Wait a minute.  Are you saying that he did

25   not understand that his making these false representations was

H7RHSERS

1   for the purpose of either him or Mr. -- I can never pronounce

2   it -- Ekdeshman to obtain money and property?

3           MR. SORRENTINO:  It was certainly for the purpose of

4   obtaining clients who would then invest with them.  That was

5   certainly the intention, Judge.

6           THE COURT:  To their detriment, as it turned out,

7   because as we know from some of the victims whose victim impact

8   statements were put before the Court, some of the victims were

9   very seriously harmed.

10          MR. SORRENTINO:  They were, Judge, and I read those

11  impact statements.

12          THE COURT:  Are you saying that he had no

13  responsibility for that?

14          MR. SORRENTINO:  No, I'm not saying that at all,

15  Judge.  I'm saying that he fully accepts the responsibility

16  that he did have, but his responsibility was in this way,

17  Judge:  He did not have an intention to "rip off people."  He

18  did not have an intention to steal their money.  Yes, he acted

19  criminally in lying to them and misrepresenting to them in

20  order to induce them to give the money, but once the money was

21  given over, he believed on a day-to-day basis that that money

22  was being transferred to Mr. Vilner who was then trading it

23  according to his computerized trading system and that the money

24  was actually being traded.  That was his belief.

25          THE COURT:  I'm not sure why that matters.  In other

H7RHSERS

1    words, you're saying that, as he's already pled guilty, he knew

2    he was making false and fraudulent statements knowingly,

3    intentionally, and willfully for the purpose of inducing people

4    to make investments that they otherwise might not have made,

5    but he didn't know for sure what the crooks he was associating

6    with would do with that money, or he had a hope and a belief

7    that they would nevertheless do good things with it?

8           MR. SORRENTINO:  Well, Judge, I believe -- and I say

9    this most respectfully to your Honor -- that it was an actual

10    belief that he had.

11           THE COURT:  All right.  So he had an actual belief

12    that the crooks he had chosen to assist were really out to do

13    good things?

14           MR. SORRENTINO:  Well, Judge, I think at the time, the

15    way the business was being conducted, it was not apparent to

16    him and it did not become apparent to him that the money was

17    actually simply not being traded.  I mean, that was never told

18    him to.

19           THE COURT:  Supposing it had been traded, contrary to

20    the facts of this case, but just to follow your argument or

21    make sure I understand it.  Are you saying that if a defendant

22    induces people to put up millions of dollars by lying to them

23    to get them to do that, but his hope, his expectation, his

24    actual belief is my friends who put me up to this will,

25    nevertheless, trade legitimately with those funds?  So

H7RHSERS

1      supposing on that scenario, if that were the actual scenario

2      and they did trade and they lost every damn penny in bad

3      trades, would that make him any less responsible?

4                MR. SORRENTINO:  I think it would make him less

5      responsible, Judge, for being a member of the conspiracy and

6      for being subjected to being sentenced by your Honor, to being

7      punished.  Our argument is that in terms of the entire case

8      with Mr. Ekdeshman, who is far more culpable for the stealing

9      of the money, receiving 87 months --

10               THE COURT:  There's no doubt that he's more culpable.

11     I'm not going to give a sentence of eight years or anything of

12     that magnitude, but we're not talking about that.  We're

13     talking about whether he deserves prison time for what he did.

14               MR. SORRENTINO:  Yes, and our argument to your Honor

15     and our submission to your Honor is that he did not deserve

16     prison time because of the fact that he did not have the

17     intention for the money to be outright stolen, Judge.  And

18     quite frankly, Judge, he will also have a very hefty forfeiture

19     imposed, as he should.  He will have a significant restitution

20     imposed, as he should.  And he will, quite frankly, Judge,

21     labor to satisfy both of those financial obligations for many,

22     many, many years to come.  He will be on probation, as we have

23     requested, for a five-year period so that his liberty will be

24     significantly curtailed.  If he is on probation, he will be

25     able to continue to address the mental health issues that he

H7RHSERS

1   has and the substance abuse issues that he has.  And quite

2   frankly, Judge, we know that, of course, not going away to

3   prison is a more desirable sentence, but we respectfully did

4   not view probation as a walk or as a light sentence or as

5   something that, quite frankly, wouldn't be significant under

6   Section 3553 to impart the seriousness of the offense when you

7   look at the entire crime and the entire conspiracy and the way

8   the various members, that being Mr. Ekdeshman and Mr. Vilner,

9   were going to be punished.

10          We also asked for it, Judge, in light of the fact that

11   he was not a longtime friend of Mr. Ekdeshman who was brought

12   into Mr. Ekdeshman's confidences and had this told to him or

13   explained to him and went forward with the intention of

14   participating in Mr. Ekdeshman's ripoff scheme.  He didn't do

15   that, Judge.  And quite frankly, we asked for it because he's

16   29 years old, it's his first offense, he has a young family,

17   and he has a child on the way.  And I know, your Honor, we

18   respect the victims and we respect the victim impact

19   statements.  I am not suggesting to your Honor that this should

20   be minimized by this.  I am merely suggesting that on balance,

21   on balance, a probationary sentence in light of all the factors

22   and circumstances is not necessarily a walk when you add to it

23   all of the other sanctions that I know the Court can and will

24   impose on Mr. Servider today.  And that is why we asked for

25   what we asked for in our sentencing submission to your Honor.

H7RHSERS

1          THE COURT:  All right.  Thank you very much.  Let me

2     hear the government.

3          MS. MAGDO:  Your Honor, I would rely principally on

4     the government's sentencing submission that was filed in this

5     case.

6          THE COURT:  I was surprised, given this Court's

7     long-standing views, that the government would try to defend

8     before this judge a guideline sentence that is mostly -- more

9     than mostly, 80 percent based on the loss calculation.  This

10    Court has many times pointed out to the government for years

11    now that while loss is clearly relevant, the notion that a

12    guideline calculation for someone who wasn't even the prime

13    mover should be determined to a level of 80 percent by the loss

14    calculation is, in this Court's view, irrational on its face,

15    totally contrary to the whole thrust of Section 3553(a), and

16    not to be seriously taken by any serious court.  That message

17    has gotten through to some of your colleagues.  I was surprised

18    it hadn't gotten through to you.

19         MS. MAGDO:  Your Honor, I'm not suggesting that the

20    guidelines, qua guidelines, provide a reasonable sentence.  All

21    I was attempting to do is start off by calculating the

22    guidelines upon which the parties agree.

23         THE COURT:  The calculation was agreed upon, but as we

24    know, that's just a start and not binding on the Court.  And

25    you argue in your memorandum for a guideline sentence,

H7RHSERS

1   suggesting that the guidelines make perfect sense in this case.

2   I don't see how that can be seriously argued, but convince me

3   that I'm wrong.

4           MS. MAGDO:  Certainly, your Honor.  Again, as I said,

5   I'm not meaning to suggest that the guidelines provide anything

6   other than an initial calculation that we're all obligated to

7   make.  The reason I spent any time on the guidelines at all is

8   that in the defense submission there was some argument that the

9   enhancements, not the loss amounts, but that the other

10  enhancements overstate the seriousness of the offense.

11          THE COURT:  Well, I mean, that may or may not be, but

12  that's not what -- if you look, for example, at page 15 in the

13  presentence report, the base level for this crime is six and

14  then we add 16 levels because the loss was more than

15  $1.5 million.  So that right there gets you up to 22 out of 28,

16  28 being the final calculation.  So even if we accepted 28 as

17  being right, that's 80 percent right there.  Has nothing to do

18  with adjustments.

19          Then, of course, two levels are added because the

20  offense involved ten or more victims.  I have no problem with

21  that.  But noticing, if you will, the absurdity, if the crime,

22  as in this case, involved maybe a hundred victims, but you only

23  add a couple of levels, even though you would think in any

24  rational calculation that that would be a significant factor.

25  But, no, the guidelines say, oh, that's just two levels because

H7RHSERS

1   we don't care so much about the victims.  What we care about is

2   the dollar amount of the loss, and we apply that regardless of

3   the role of the offender, or largely regardless of that.  What

4   are those guys thinking and what are you thinking in supporting

5   that kind of approach?

6          MS. MAGDO:  So I have to go through the guidelines.  I

7   have to say what the guidelines are that the parties agreed on.

8   I spent roughly two pages just walking through the guidelines,

9   then I spent five pages going through the 3553(a) factors.  My

10  first factor was that Servider harmed scores of victims, and I

11  think that's not adequately captured by the two-point

12  enhancement.  I think that's a very serious issue in this case.

13  I might also add these are not sophisticated investors.  These

14  are people that they bought their phones numbers --

15         THE COURT:  I'm just pointing out how the guidelines

16  don't really meaningfully address that aspect at all.  By the

17  way, when there's four points for the fact that it was

18  commodities or the offense involved a violation of the

19  commodities law, why should that matter opposed to a violation

20  of any other law?

21         MS. MAGDO:  Again, all I can say is that the

22  sentencing commission thought that people who --

23         THE COURT:  Yeah, they did.  That's why I'm saying

24  they're irrational.

25         MS. MAGDO:  Well, be that as it may --

H7RHSERS

| | |
|---|---|
| 1 | THE COURT:  Yes, but you're the one that says that I |
| 2 | should impose a guideline sentence because the calculation is a |
| 3 | good place to start. |
| 4 | MS. MAGDO:  It is a place where we must start, but I |
| 5 | believe that based on the 3553(a) factors, a sentence of 57 to |
| 6 | 60 months is sufficient, but not greater than necessary, in |
| 7 | this case.  I'm happy to walk through the reasons. |
| 8 | THE COURT:  You don't disagree that Mr. Ekdeshman was |
| 9 | the prime mover? |
| 10 | MS. MAGDO:  He was the one who originally started the |
| 11 | first fraud, yes.  Whether he was the prime mover in the second |
| 12 | fraud, I guess it depends what you're getting at. |
| 13 | THE COURT:  Well, what I'm getting at is while I don't |
| 14 | accept the suggestion that was made in some of the letters to |
| 15 | the Court that this defendant somehow had his will overborne by |
| 16 | this other gentleman, or anything like that -- and he himself |
| 17 | is not saying that; that's more other people -- it's hard to |
| 18 | see that he in any way is in the same basket as Mr. Ekdeshman. |
| 19 | MS. MAGDO:  Absolutely.  If we want to say that |
| 20 | Mr. Ekdeshman was culpable for twice the amount of fraud, let's |
| 21 | say, because he did the two schemes, I think that a sentence of |
| 22 | half of 87 months would be reasonable. |
| 23 | THE COURT:  OK.  Now we're talking closer to my |
| 24 | language.  So you don't need to tell me why there needs to be |
| 25 | prison time here.  I've heard the various arguments of defense |

H7RHSERS

1    counsel, but I'm not persuaded.  So the real question is where

2    the sentence should be.  And to my mind, something that neither

3    side has addressed as fully as they might, there's a body of

4    literature that suggests that in white-collar cases some prison

5    time is very important to send a general deterrence message,

6    but there's no study that indicates that a lot of prison time

7    has a meaningfully different effect on a white-collar persons

8    who are contemplating -- the most important factor, all the

9    studies show, is that people who commit these crimes get

10   caught.  The second most important factor is that there be some

11   prison time.  But there's no study that indicates, for example,

12   that six years is three times a better deterrent than two

13   years, to take an example.

14           So where do you think the Court -- I release you from

15   any obligation you may have under Department of Justice

16   guidelines to argue for a guideline sentence.  Do you have a

17   view as to what is the appropriate sentence?

18           MS. MAGDO:  Well, quite frankly, your Honor, I have

19   thought about this a lot in connection with his culpability

20   compared to Mr. Ekdeshman.  Undoubtedly, Mr. Ekdeshman was at

21   least twice as culpable as Mr. Servider, but I do think that,

22   contrary to what the defense argues now, Mr. Servider set out

23   and started EJS with fraudulent intent.  It was a fraud from

24   day one.  I think that's actually a very important factor

25   compared to other cases where someone starts a legitimate

H7RHSERS

```
1    business, they make some failing investments, and they panic
2    and they try to cover them up with additional investments, then
3    they lie to their investors.  So I think that's an important
4    factor here.
5          I think another important factor is that even after
6    the CFTC shut down the original fraudulent operation,
7    Paramount, Mr. Servider continued with the fraud of EJS.  Even
8    after Mr. Ekdeshman was arrested in connection with running
9    Paramount, Mr. Servider continued to run EJS.  I think that's
10   very troubling.  I think that goes to specific deterrence and
11   the need for a substantial sentence in this case.
12         In terms of numbers, I would say in the range of half
13   of what Mr. Ekdeshman received as a term of imprisonment would
14   be reasonable.  Mr. Ekdeshman -- it's so personal.  I reread
15   the sentencing transcript of Mr. Ekdeshman, which I didn't
16   myself handle.  He had a child with a serious illness.  At the
17   same time, after the CFTC shut down his first enterprise, he
18   immediately turned around and started with Mr. Servider the
19   second enterprise.  So he was in violation of a court order, an
20   injunction, not to participate in this industry.  So he --
21         THE COURT:  By the way, the record should reflect,
22   this was before Judge Broderick, I believe.
23         MS. MAGDO:  That's correct.  So, again, it's very
24   individual.  He had some mitigating circumstances, some
25   aggravating circumstances, neither of which are true for
```

H7RHSERS

1   Mr. Servider.  I would say there aren't any particularly

2   persuasive mitigating factors in Mr. Servider's case, and I

3   think the aggravating factors are the ones that I stated.

4           THE COURT:  All right.  Very good.  Let me hear,

5   first, anything the defense counsel has to say and then from

6   the defendant if he wishes to be heard.

7           MR. SORRENTINO:  Judge, what struck me from the

8   government's argument just now was the fact that if you do read

9   Mr. Servider's statement to the Court, there are so many

10   actions that he took during the life of EJS which would

11   indicate that he was seeking to actually establish trading and

12   compliance, etc.  A person who is proceeding with the knowledge

13   that he is participating in an outright scheme to steal and has

14   no idea that the government is looking at him is taking action

15   every day that he intends to be his actual way that he intends

16   to conduct himself.

17           THE COURT:  I come back to the point -- I get your

18   point, and I think that is a mitigating factor, but I think it

19   only cuts modestly in your favor because a person who lies to

20   people in order to get them to invest is stealing their money.

21   You talk about theft.  That's theft.

22           MR. SORRENTINO:  Judge, I can't argue against the fact

23   that we recognize in the law that fraud can be committed in

24   many ways, and that one of the ways --

25           THE COURT:  It's not just -- excuse me.

H7RHSERS

1            MR. SORRENTINO:  Yes.

2            THE COURT:  I don't think you need to be a lawyer to

3      understand this.  If I walk up to someone and say, "Would you

4      like to buy the Brooklyn Bridge?" and, of course, I don't own

5      the Brooklyn Bridge, every two-year-old understands that's a

6      fraud, and that's the functional equivalent of what he did.

7            MR. SORRENTINO:  Although, Judge, in this particular

8      instance, there was another party involved -- if I may just

9      finish -- and when he was making his representations to get the

10     money, quite frankly, he was committing the fraud at that point

11     in time, but he wasn't taking various sums of money from

12     investors saying:  Aha, I know this money's being ripped off.

13     I know it's never going to be invested.  I know that these

14     people are simply giving us money so I can give it to

15     Ekdeshman, and he's going to do whatever he does with it with

16     Vilner.  He didn't know that, Judge.  So he overstepped the

17     line in, quite frankly, his failure in judgment and his failure

18     in morality to get these investors to invest under the proper

19     pretenses.  He used false pretenses, but not because he thought

20     he was robbing and stealing their money at the time because,

21     quite frankly, Judge, he thought it was going to Vilner, while

22     Vilner was using it in his system, his computerized system.

23            If I may just say this, your Honor:  Originally, when

24     the government gave us -- or arrested Mr. Servider, they gave a

25     complaint which laid out the scheme.  They gave a breakdown of

H7RHSERS

the money and how it had been allocated and paid and spent,
etc.  They gave a breakdown of about $1,658,000, but if you
look at the breakdown of where that money went, only 85,000
went to Mr. Servider.  So I suggest to your Honor that if
Mr. Servider is a willing participant in the outright ripoff of
the victims' money, he would have made sure that he was getting
a much larger cut of what was being ripped off.  That didn't
happen because he didn't know the money was being ripped off.
He didn't know that he could just take as much as he wanted to
because, quite frankly, Judge, he wasn't of the same mindset as
Ekdeshman and he wasn't of the same mindset as Vilner.

          So I understand where the government comes to you and
suggests to you that if you look at Ekdeshman and he got 87
months, maybe we should cut it in half.  I respectfully suggest
to you that even half of Ekdeshman's sentence would far, quite
frankly, over-punish Mr. Servider for his part in the
conspiracy that took place here.  It's plain to me now that
your Honor is not going to sentence Mr. Servider to probation.
That's obvious to anybody sitting in this courtroom.  However,
judge, I would suggest to your Honor, most respectfully, that
the government's suggestion that somehow half of Ekdeshman's
sentence is fair under Section 3553, I would argue to your
Honor that I do not believe it is fair under Section 3553
because I believe it would be over-punishing Mr. Servider under
the factors that we are to take into consideration under that

H7RHSERS

statute.  And I respectfully suggest to your Honor that an --

in our memo, Judge, we did, of course -- I'm sure your Honor is

well aware of it -- on page 10 just mention for a moment that a

2015 survey of the months of imprisonment for fraud defendants

in criminal history category I, as is Mr. Servider, were 34 and

24 months respectively after a trial.

So, quite frankly, Judge, I don't know, of course,

what went into those statistics and I don't know what those

trials were about, but just as an indication, those numbers

would be significantly less than what the government is asking

for.

THE COURT:  But as you, I think, correctly appreciate,

those numbers mean very little for any individual case.

There's another number that the government sometimes tries,

though I was glad to see they didn't in this case, which is

according to the sentencing commission, over 50 percent of

white-collar defendants go on to commit further crimes.  So

there's a 50 percent recidivism rate.  But that is, if you

actually get into the weeds there, because they're talking

about either people who commit very low-level embezzlements

often because of economic needs, they get out, and they commit

another embezzlement, or they're talking about professional con

men who commit dozens of crimes.  All these global statistics,

frankly, are near meaningless going both ways.

So let me hear from the defendant if he wishes to be

H7RHSERS

1  heard.  I'm sorry, the government.

2           MS. MAGDO:  May I respond just briefly to one thing

3  defense counsel said?

4           THE COURT:  Yes.

5           MS. MAGDO:  And that's the point that Servider only

6  made -- I think he used a number in the 80,000 range, and that

7  is because paid directly to him in his name was approximately

8  roughly $80,000, but there was also $126,000 that was withdrawn

9  as cash out of the investor funds, and $166,000 that was used

10  for debit card purchases.  And we don't know which of the two

11  of them did that.

12           Finally, it's reflected in the fact that he's agreed

13  to forfeit to a money judgment of $373,000.  That's a much more

14  accurate reflection of what he profited from the scheme.  That

15  is represented as the number that is the dollar amount that he

16  himself took in and received the benefit of.  So just to clear

17  that up.

18           THE COURT:  Let me hear from the defendant if he

19  wishes to be heard, unless there's anything else from defense

20  counsel.

21           MR. SORRENTINO:  No, Judge, but Mr. Servider does have

22  a prepared statement he'd like to read to your Honor.

23           THE COURT:  Sure, absolutely.

24           THE DEFENDANT:  Your Honor, thank you for letting me

25  speak here today.  I don't want to take up too much of the

H7RHSERS

1    Court's time.

2              MR. SORRENTINO:  Slow down.

3              THE DEFENDANT:  As you know, I wrote you a pretty

4    lengthy letter, so I'm sure that you -- I believe that you know

5    where I stand on the matter at hand.

6              First, I'd like to extend my sincerest apologies to

7    the victims in this case.  I know many people were affected by

8    this, and they will never truly know how sorry I am.  I never

9    meant for any of this to happen.  I want to apologize to my

10   family for letting them down.  They are honorable people that

11   raised me the right way.  All I ever wanted to do was make them

12   proud.  Last thing, I want to apologize to my wife Patricia for

13   putting her through all this.  She's expecting our first baby,

14   and I want to thank her for standing by me through all this.

15             And, your Honor, I've made mistakes here, and I've

16   never been to court in my life, but I've grown and learn a lot

17   from them.  I stand before you today asking for your mercy to

18   allow me to move past this and give me the opportunity to try

19   to right my wrongdoings.

20             Thank you, your Honor.

21             THE COURT:  Thank you.

22             So the Court has already indicated in general terms a

23   lot of the considerations that it thinks are relevant here to a

24   sentence under Section 3553(a).  First, as everyone agrees, it

25   should be substantially less than the sentence for

H7RHSERS

1    Mr. Ekdeshman.  Second, the just punishment component alone of

2    Section 3553(a), in the Court's view, mandates prison time here

3    because this was a substantial fraud in which the defendant's

4    participation was part of what led to very numerous victims,

5    suffering very real harm.  So even before we get to other

6    questions like deterrence, it's clear that the sentence must be

7    less than eight years and must be more than zero.

8           In terms of specific deterrence, I think I'm convinced

9    not only by the excellent defense submission but really by the

10   defendant's own statement that specific deterrence is probably

11   not warranted here.  This defendant is probably not going to

12   commit future offenses, not the least because of the harm that

13   he foreseeably, in effect, did to his own family.  So I don't

14   think he'll make that mistake again.

15          General deterrence is one of the most difficult

16   aspects to calculate in a situation like this because, as I

17   indicated, the criminological studies which go back over 200

18   years, it's one of the first areas that was studied, but it's a

19   very difficult one to study in a meaningful way because there's

20   so many factors involved.  And to get technical for a moment,

21   you can't really do a meaningful regression analysis in this

22   area because there are too many imponderable factors, but there

23   is at least a consensus as to the following:  First, that the

24   most important factor of all is catching defendants, and

25   catching them in this and other schemes on a regular basis.

H7RHSERS

1   That's not really a guide to this Court in imposing sentence in

2   an individual case, but I just mention that so the record is

3   complete.

4           The second most important factor is some prison time,

5   and I must say that's also consistent with the Court's own

6   experience now in 21 years of being a judge.  Nothing sends the

7   same deterrent message in a white-collar case as actual prison

8   time.  But the studies, which are far from definitive,

9   nevertheless suggest that short of real extremes, like 20, 30,

10  40 years, added time beyond a certain modest minimum doesn't

11  serve a sufficient or even calculable additional deterrent,

12  general deterrent effect.  So there's no study, literally no

13  study, that shows that, as I mentioned before, six years is

14  three times better in deterrence or even twice as good in

15  deterrence as two years.  No one knows the answer to how much.

16  We know that some prison time is necessary.  That's all we

17  really know.  Yes, capital punishment serves a further

18  deterrent effect, but we're not in that kind of situation here.

19          So we come back to other factors, like considering

20  disparities between sentences, considering the defendant's

21  character, which is always a factor that looms very large in

22  this Court's sentencing.  And there's no sure way to arrive at

23  a perfect sentence, but Section 3553(a) also says that when in

24  doubt, do not impose more than is necessary to achieve the

25  functions of Section 3553.

H7RHSERS

1          So weighing all that together, I think the right

2     sentence is 18 months.  So the sentence of the Court is that

3     the defendant is sentenced to 18 months in prison to be

4     followed by three years of supervised release on terms I'll get

5     to in a minute.  No fine will be imposed because there is a

6     very substantial restitution amount and a forfeiture amount

7     that must be paid.  There's also a mandatory special assessment

8     of $100.

9          In connection with restitution and forfeiture, did the

10    government prepare appropriate orders?

11         MS. MAGDO:  Yes, your Honor.  We had submitted the

12    preliminary order of forfeiture money judgment back at the time

13    of the plea, and we have now entered a final order.  And with

14    respect to the restitution, the parties have agreed to the

15    restitution, and we submitted an order earlier today.  I'm

16    sorry for the last-minute notice with the --

17         THE COURT:  Let me just fish that out.  I may have

18    left that downstairs.  Do you have another copy?

19         MS. MAGDO:  I do have extra copies.

20         THE COURT:  So the restitution is in a total amount of

21    $2,124,182.66, but there is joint and several liability with

22    Mr. Ekdeshman.  And the order appropriately, while spelling out

23    to whom the restitution must be paid, does not indicate the

24    terms of payment for this defendant.  I will, by the way, sign

25    right now the restitution order and give it to my courtroom

H7RHSERS

deputy to docket.  But the terms of the restitution are that in

addition to being joint and several, it will be paid at the

rate of 10 percent of this defendant's gross monthly income

beginning with the second month of his supervised release.

        Now, there will also be imposed, so far as supervised

release is concerned, the mandatory conditions that the

defendant not commit any federal, state, or local crime; that

he not unlawfully possess a controlled substance; that within

15 days of his release from imprisonment, he submit to one drug

test to be followed by two periodic drug tests; and that he

cooperate in the collection of DNA.  There will also be imposed

the standard conditions one through 13.  They appear on the

face of the judgment and will be gone over with the defendant

by the probation officer when the defendant reports to begin

his period of supervised release.

        Finally, there are the special conditions.  First,

that the defendant must participate in an outpatient treatment

program for drug and alcohol abuse on the standard terms and

conditions; second, that he must provide the probation officer

with access to any requested financial information; third, that

he must not open new credit card charges or additional lines of

credit without the express prior approval of the probation

officer unless he is in compliance with the 10 percent

installment payment schedule; and, lastly, that he will be

supervised by the district of his residence.

H7RHSERS

1          Now, before we talk about surrender date and right of

2     appeals, is there anything else that either counsel needs to

3     raise with the Court?  Anything further from the government?

4          MS. MAGDO:  Your Honor, my only request would be that

5     the list of the victims as attached to the restitution order be

6     filed under seal.

7          THE COURT:  Yes, that makes perfect sense.  That will

8     be done.

9          MS. MAGDO:  Thank you.

10         THE COURT:  Anything from the defense?

11         MR. SORRENTINO:  Nothing.  I think we'll have a

12    request of your Honor when we move on to the surrender date.

13         THE COURT:  Yes.  So let me ask my courtroom deputy.

14    We would probably have a surrender date about 90 days from

15    here.

16         THE DEPUTY CLERK:  October 27, a Friday.

17         THE COURT:  October 27 at 2:00 p.m., any problems with

18    that?

19         MR. SORRENTINO:  Judge, he would surrender to the

20    marshals, not to his place of designation?

21         THE COURT:  That's OK if he wants to do that.  Don't

22    you prefer to have him surrender to the place of designation?

23         MR. SORRENTINO:  I was going to ask your Honor to make

24    a recommendation that he be incarcerated at Fort Dix since

25    his --

H7RHSERS

1          THE COURT:  Well, I will make that recommendation,

2    but, as you know, I can't order that.

3          MR. SORRENTINO:  Yes.

4          THE COURT:  But I think you would prefer, you tell me,

5    that wherever he's designated --

6          MR. SORRENTINO:  I would prefer he surrender right

7    there.

8          THE COURT:  -- surrender at the point of designation,

9    otherwise he gets transported on the local bus, which is not a

10   happy thing usually.

11         MR. SORRENTINO:  Yes, you're right, your Honor.  We

12   want him to go right to the facility.

13         THE COURT:  Very good.  Mr. Servider, you have a right

14   to appeal the sentence.  Do you understand?

15         THE DEFENDANT:  Yes.

16         THE COURT:  If you can't afford counsel for the

17   appeal, the court will provide one for you free of charge.  Do

18   you understand that?

19         THE DEFENDANT:  Yes, your Honor.

20         THE COURT:  Very good.

21         MS. MAGDO:  Your Honor, I'm sorry.  The government

22   moves to dismiss any underlying counts.

23         THE COURT:  Very good.  That motion is granted.

24         MS. MAGDO:  Thank you.

25          (Adjourned)